Filed 9/18/24  In re D.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re D.S., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E083794 |
| Plaintiff and Respondent, | (Super.Ct.No. J293358) |
| v. | OPINION |
| V.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

V.S. (mother) appeals from the juvenile court's order terminating her parental rights to her now three-year-old son, D.S. Mother contends the court erred in failing to apply the parent-child benefit exception in her favor. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); all further statutory references are to this code.) As we explain, mother does not meet her burden to show the juvenile court abused its discretion. We therefore affirm the termination order.

FACTUAL AND PROCEDURAL BACKGROUND

In late May 2022, the county children and family services agency (CFS or agency) received a referral stating concerns mother neglected and emotionally abused D.S., who was 16 months old at the time. The social worker's telephone contact with D.S.'s maternal grandmother (hereafter MGM) indicated mother suffered untreated mental health issues, combined with drug abuse. Mother had a history of both suicidal ideation and aggressive conduct towards MGM. MGM and the maternal grandfather (MGF) were D.S.'s primary caretakers. The social worker could hear mother in the background yelling and screaming at MGM. Police responded to the home during the call, confirmed to the social worker multiple prior visits to address mother's conduct, and expressed concern for D.S. in mother's care.

The social worker's investigation revealed a prior referral in which mother's threats of self-harm resulted in a psychiatric hold. The referral indicated three prior psychiatric holds for mother, who took her psychiatric medications initially but would not

refill prescriptions. Mother expressed she enjoyed feeling "out of control" without medication.

On June 2, 2022, CFS filed a dependency petition seeking the juvenile court's protection for D.S. because of mother's untreated mental health problems, substance abuse, and domestic violence incidents. (§ 300, subd. (b).) The court subsequently sustained the petition. CFS's prognosis for reunification was "guarded."

Through the initial review period, mother only "marginally" engaged in services. She was arrested for threatening to slice her boyfriend's throat while he slept and while D.S. was present in the home. She missed drug tests, tested positive for fentanyl, and refused to document medication compliance. By February 2023, CFS recommended terminating mother's reunification services and setting permanency planning selection and implementation hearing (hereafter .26 hearing; see § 366.26).

Mother consistently visited D.S. During visits, she taught him colors and fed him healthy foods. In mid-March 2023, after mother began treatment with a psychiatrist and consented to further parenting, counseling, and substance abuse treatment referrals, CFS changed course. The juvenile court granted CFS's recommendation to continue reunification services. Mother's visitation, at two hours per week, remained supervised.

Her visitation briefly increased to all day, three days a week at the maternal grandparents' home, after mother provided several negative drug tests, attended counseling sessions, and reported taking her medication. On one particular visit, the social worker observed mother engage well with D.S., attending to him when he hit his

3

head while playing, correcting his speech, and the child enjoyed mother pretending to cook for him while they played.

At the beginning of August 2023, reunification prospects brightened further when mother participated in a mediation program in which she and CFS charted out steps to potentially transition D.S. to mother's care. These included mother resuming drug testing and seeking an evaluation with her psychiatrist, after a lapse in which she acknowledged she stopped taking her medication. Plans were made for an extended 29-day visit in which mother would care for D.S. at MGM's residence.

The plans fell apart within a month, scuttling the extended visit. Mother tested positive for marijuana contrary to her mediation pledge, missed her outpatient drug treatment intake appointment, discontinued taking her Prozac prescription, and instead sought medical clearance to reunify with D.S. without medication. She did not obtain clearance. Instead, her psychiatrist concluded, "I don't deem her safe to be reunified with her son," noting "she has not been forthright in our sessions."

Mother regressed further. MGM remained concerned that mother was abusing drugs and that she did not prioritize D.S.; the opportunity for mother to move in with her parents evaporated. Mother rented a room with unknown individuals, whom she would not disclose to CFS to assess her residence for visits. She did not want them "to know her business." CFS recommended terminating reunification services, and the court did so at the 12-month review hearing in October 2023. The court scheduled a .26 hearing.

4

CFS's report for the hearing reflected that, though mother's visits "have been shortened" to her former baseline of once a week for two hours, she kept up with them. D.S. appeared "to enjoy the time he spends with his mother." Mother was attentive to D.S. during the visits, which were "warm and caring," and MGM confirmed the visits went well despite mother's continuing conflict with her. CFS's report indicated D.S. "is bonded to . . . mother."

Mother testified at the .26 hearing regarding her bond with D.S., who was now three years old. Visits usually began with D.S. running to her saying, "Mommy," and "get[ting] really excited," "super excited" to see her. They would hold hands, with D.S. pulling on hers while walking; he loved hugs, and she noticed that when she hugged him, "he likes to tap my back." Mother was consistent with her visitation, missing it only if she was sick or working, or if D.S. was "out of state" when MGM made efforts to keep D.S. in contact with both maternal and paternal relatives. Mother acknowledged she had not progressed to unsupervised visitation.

Nevertheless, mother emphasized her bond with D.S., describing it in terms of her protectiveness of him: "I . . . honestly don't think anyone would protect him the way that I would protect him. I would show that ten times over with my body in any kind of incident." She also testified D.S. "is better with me being in his life. He's brighter. When I'm in the room, we fill each other up, we make each other—he's made me a better person." Additionally, mother felt he "eats more when I'm around," is "more confident," "is more secure," and "I can tell that he feels safer." Their bond included "his security of

5

how he is with me," sharing "his emotions when he's sad or when he tells me he loves me, when he's upset. Whatever he's feeling, he's pretty open about it when I ask."

After minor's counsel sided with CFS in supporting termination of parental rights and adoption by MGM and MGF as being in D.S.'s best interests, the juvenile court made several observations. The court noted D.S. had been detained when he was 16 months old, now was 40 months, and had "spent a majority or more than half his life outside of the custody of his mother."

The court addressed the parent-child benefit exception to termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) "[B]ased on the testimony and also what's reflected in the reports," the court found "mother has met the first [prong] as to regular visitation and contact." The court also found mother showed "there is a relationship between herself and [D.S.]" and that "continuation of that relationship would benefit the child." Regarding "Element Number III," however, the court concluded "mother has not met her burden of proof, that termination of parental rights would be detrimental to the child."

On the last element, the court noted "no evidence" indicating "issues with emotional dysregulation at the end of the visit[s] or that [D.S.] is experiencing night terrors or nightmares or any issues . . . provid[ing] evidence of a detriment." Accordingly, the court found "this is not a case in which exceptional circumstances would permit the court to choose an option other than adoption."

The court terminated mother's and father's parental rights, maintained adoption as D.S.'s intended permanent plan, and only mother now appeals.

DISCUSSION

Mother contends the statutory parent-child benefit exception precluded terminating her parental rights. Just as mother did not meet her burden to establish the exception below, she does not meet her appellate burden for reversal.

"If the [juvenile] court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The purpose of the hearing is "'to select . . . a permanent plan for the child.'" (*Ibid*.) Section 366.26 lists permanent plans in order of preference, with adoption having the highest priority. (§ 366.26, subd. (b)(1); *In re Edward R.* (1993) 12 Cal.App.4th 116, 122.)

Section 366.26 provides that if the court finds the child is likely to be adopted, "'the court shall terminate parental rights'" (subd. (c)(1)) unless an exception applies. (*In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).) One exception includes when "[t]he court finds a compelling reason for determining that termination would be detrimental [because] [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

There are "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would

7

*benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The nature of an exception "merely permit[s] the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

A hybrid standard governs our review. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The first two elements involve factual determinations to which the substantial evidence standard of review applies. (*Id.* at pp. 639-640.) The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion. (*Id.* at p. 640.)

The agency does not dispute that mother established the first two prongs of the exception. Therefore, our review centers on the third. (See *Caden C.*, *supra*, 11 Cal.5th at p. 636 [parent bears burden to demonstrate all three elements]; *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1075 [parent's failure to prove one element requires affirmance].)

In essence, mother argues that because she established the second element of the parent-child exception, i.e., some benefit to D.S. from their relationship, she necessarily established the third. She contends the evidence "showed [D.S.] benefited from his relationship with mother" and thus also showed "it would be detrimental to terminate that strong bond."

As the juvenile court observed, however, there was no palpable evidence of detriment. In *Caden C.*, the court gave examples of detriment in terms of "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia,

8

anxiety, or depression." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  None of these were evident as a likely outcome here.  (See *ibid.* [although not inevitable, "courts must assume that terminating parental rights terminates the relationship"].)  To the contrary, as the court observed, D.S. spent the majority of his young life with mother only marginally involved, and nevertheless thrived.  More specifically, D.S. lived all but two hours of every week without mother by his side, and yet he still separated easily from her at the end of visits.  He did not ask to see her more frequently, and nothing indicated any emotional dysregulation *for D.S.*  (See *id.* at p. 632 ["focus is on the . . . child"; "courts often consider how children feel about, interact with, look to, or talk about their parents"].)

More broadly, given the preference for adoption, "in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.)  This is "not [a matter of] comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.)  Rather, "to justify withholding the 'security,' 'stability' and "'sense of belonging [that] a new family would confer'" [citation], the parents must prove more than "'*some* benefit'" [citation]." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 820.)

"[T]he parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would

9

be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Thus, "[f]riendly or affectionate visits are not enough." (*In re G.H.* (2022) 84 Cal.App.5th 15, 25.)

The juvenile court reasonably could conclude mother showed no significant detriment. A court abuses its discretion only when it """"exceed[s] the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."""" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) A reviewing court "'should interfere only "'if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.'""" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) Mother did not meet that high burden here.

DISPOSITION

The juvenile court's order terminating mother's parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

10